# MASSACHUSETTS BAR EXAMINATION

| SECOND DAY | MARCH 1, 2007 | ESSAY SECTION |
|---|---|---|
|  | MORNING PAPER |  |
|  | QUESTIONS |  |

1.     Olsen died testate in 1995 and left Blackacre, a house and several acres of land located in Town, to his two sons, Al and Bob "for their joint lives and then to the survivor". Al resided at Blackacre for the past ten years and has paid the taxes during this period. Bob conveyed his interest in Blackacre to Charles in 1999.

Al listed Blackacre for sale with a licensed Broker for $1 million dollars. Broker negotiated with Paul, to buy Blackacre. On November 1, 2006, Al entered into a written contract with Paul to sell him Blackacre for $900,000, and Paul gave Al a $200,000 deposit. The closing was scheduled for February 2, 2007. Al also agreed to pay Broker a 10% commission for negotiating the sale.

On December 1, 2006, Town took 20% of Blackacre by eminent domain. Al died on December 10, 2006 and left a will giving his realty interests to his friend Jim and his personal property to Al's three surviving children.

On December 15, 2006, Paul notified Fred, the executor of Al's estate, that he would not buy Blackacre and demanded a refund of the $200,000 deposit. Fred has refused Paul's demand to return the deposit. Broker has demanded that Fred pay him the 10% commission.

What are the rights of the parties?

2. Consumer brought a class action lawsuit in the United States District Court in Boston alleging that the defendant, Dryer, had manufactured clothes dryers with defective heating coils. Consumer's complaint identified the class members as 60,000 individuals in New England who had bought the dryers between 2000-2004 and had suffered losses as a result of the defective coils which could catch fire quickly causing both personal injury and property damage. The alleged losses ranged from a $100 cost to replace the defective coils to serious personal injury and property damage.

Consumer's claim involved the $100 coil replacement cost Consumer's complaint alleged that federal jurisdiction was based on a breach of warranty claim under a recently passed federal consumer product safety statute.

Consumer sought to certify the class and Dryer objected claiming that there were many other lawsuits by individual Dryer owners alleging extensive personal injuries and/or property damage as a result of Dryer's defective coils during the years in question. Dryer also noted that a nearly identical class action against Dryer based on state law warranty claims was presently pending in another State. That action, in which Consumer was also among the lead plaintiffs, sought relief similar to the Massachusetts federal action and sought to represent essentially an identical class of plaintiffs. The plaintiffs in both cases were represented by the same small law firm of newly admitted lawyers who had not previously represented parties in class actions. In its opposition to Consumer's motion for federal class certification, Dryer moved to dismiss the federal case because of the pending State class action.

While Consumer's and Dryer's motions were pending and before the Court ruled, Consumer hand delivered a deposition notice to Dryer demanding that Dryer's President appear for a deposition. Dryer moved for a Protective Order claiming that its "officers, directors and managing agents" were beyond the subpoena power or other authority of the Court.

How should the Court rule on the pending motions?

3.     David was charged with vehicular homicide of Vance, a pedestrian. Vance had been out walking with his wife, Whitney, when he was struck and killed by a motor vehicle allegedly driven by David. At David's trial in the Massachusetts Superior Court, the following occurred:

(a) On direct examination by the Commonwealth, Whitney testified over David's objection that she observed the white van which struck and killed Vance traveling at a rate of speed in excess of 80 miles per hour.

(b) On direct examination by the Commonwealth of Officer, a police officer, the Commonwealth offered Officer's police report, which was admitted in evidence over David's objection. The report included the following statements:

> (1) "I arrived at the crime scene only minutes after the incident. There I encountered Whitney, who stated: 'Oh my God, my husband was just struck by a white van. It was David's van; I'd know it anywhere.'"
>
> (2) "As a result of my investigation, it is my opinion that David was the driver of the white van which struck Vance."

(c) On direct examination by the Commonwealth, Sally, David's fourteen year old daughter who lived with David, testified over David's objection that David had told her that he had been driving the white van which struck and killed Vance.

(d) On direct examination by the Commonwealth, Minister, an ordained minister at David's church, testified over David's objection that David had visited her at her home a week after the incident and told her: "I did something terribly wrong. Can I ever be forgiven?"

(e) On direct examination by David, Albie, a friend of David, testified that at the time of the incident, David was at his house playing poker. Thereafter, on cross-examination, the Commonwealth offered certified copies of the following documents, which were admitted in evidence over David's objections:

    (1) The record of Albie's conviction for attempted murder eleven years earlier for which he had received a sentence in state prison.

    (2) The record of Albie's conviction for disturbing the peace six years earlier for which he received a suspended sentence.

(f) On further cross-examination, Albie was shown a check for $1,000 written to him by David just before trial and then was asked whether David had paid him to testify about David playing poker at his house. Thereafter, on redirect examination, David offered Albie's written statement given to the police two weeks after the incident, which substantiated the testimony he had given on direct examination. The statement was admitted over the Commonwealth's objection.

    In each instance, were the trial judge's rulings correct?

    4.    Mary and Jane, both attorneys, were married two years ago in Massachusetts. The day before their marriage, Mary and Jane each fully disclosed their assets to the other and signed an antenuptial agreement (the "Agreement") in which each of them agreed that if they were ever divorced (i) they would divide any joint marital property evenly, (ii) they would not seek or accept any property that the other brought into the marriage, and (iii) they would not seek or accept child support or alimony from the other. The Agreement was drafted and reviewed by an attorney representing Jane. Mary did not hire an attorney to review the Agreement as she "trusted Jane."

    At the time of the marriage Jane had a two year old adopted child, Philip, and Mary was three months pregnant. When Mary gave birth in Boston six months later to Charles, Mary and Jane were listed on his birth certificate as his parents. Mary has treated and referred to Philip as her son, although she did not adopt him. Mary, Jane, Philip and Charles lived in a house in Boston owned by both Mary and Jane. The down payment for this house came only from Mary.

    Jane was the sole supporter of the family, while Mary stayed at home taking care of Philip and Charles. Mary had no savings, while Jane had over a million dollars in savings from an inheritance that she received when her mother died three years ago.

    Yesterday Jane got drunk and hit Mary with a baseball bat, breaking Mary's leg, when she learned that Mary was having an affair with Lisa. As a result, Mary decided to end her marriage with Jane in order to live in her house with Philip, Charles, and Lisa.

    What are the rights of Mary and Jane?

5.      Hockey, Inc. ("Hockey"), a Massachusetts corporation, owned and operated hockey rinks. Hockey was wholly owned by Bill and his sister, Sue, who were Hockey's sole directors, officers and shareholders. Hockey acquired several Massachusetts hockey rinks and created separate subsidiary corporations to operate each rink. Bill and Sue were the directors and officers of each of the subsidiary corporations, one of which was called Hockey North, Inc. ("North"). Hockey and the subsidiary corporations had their principal offices at the same address, and the same person managed all of the businesses. Bill participated in the operation of all of the corporations and regularly sent out memoranda on "Hockey" letterhead to the various managers of the hockey rinks concerning rink policy and operations. Bill transferred money to and from his personal account to Hockey's account to pay Hockey's expenses.

Ed was employed by North and worked at one of the rinks. One Friday, during lunch, Ed drove to Hockey's corporate offices in his own vehicle to pick up payroll checks for himself and two co-employees and to attend a company meeting called by Bill. While driving to the offices, Ed lost control of his vehicle striking Claire and seriously injuring her. Shortly after the accident, North became insolvent and ceased doing business.

While working for Hockey, Sue learned of a hockey rink that was for sale in western Massachusetts. Sue had several meetings with the owner of the rink. As negotiations proceeded, Sue, without telling Bill, asked Hockey's Attorney to create a corporation so that Sue could acquire the rink in western Massachusetts, Sue asked Attorney not to tell Bill about this transaction. Attorney complied with Sue's request, creating a new corporation called Western, Inc. ("Western") and making Sue the sole director, officer and shareholder. Sue acquired the rink in Western's name and its operation has been very profitable.

What are the rights of the parties?

**MASSACHUSETTS BAR EXAMINATION**

SECOND DAY             MARCH 1, 2007            ESSAY SECTION
**AFTERNOON PAPER**
**QUESTIONS**

       6.        Bob lived with Jane in an apartment building called Gardenside, owned by Realty and managed by Stan, the resident superintendent. Bob was late for a meeting and decided to leave the building by the stairs. Although the stairway was dark because several light bulbs had burned out, Bob skipped every other step while talking on his cell phone. He fell on the stairway over a toy left on the landing by Child, age 4, who lived at Gardenside with his parents, Frank and Maggie. Bob injured his neck and back. Other residents of Gardenside had complained to Stan about toys being left on the stairway.

       Bob got up and hurried to his car, planning to have a doctor check his injuries later. He got into his car and turned on the radio and air conditioner. While leaving the parking lot at Gardenside, Bob talked on his cell phone. He did not use his seatbelt. As Bob approached a railroad crossing, he slowed down and looked to his left. Bob's view to the left was blocked because Tim, a truck driver for Furniture Company, had parked its truck by its store in a "No Parking" zone while the delivery crew took a break. Furniture Company had received parking tickets in the past for parking its truck illegally.

       Bob looked to his right and then seeing that the railroad crossing gates were open, he proceeded in his car across the railroad tracks. As he crossed the tracks, he was surprised to see a train, operated by Engineer, coming toward him from the left and out from behind Furniture Company's truck. Bob froze on the tracks unable to move. The train crashed into Bob's car, pushing it several hundred yards down the track and into a ditch.

Witnesses at the scene stated that they did not hear any signal or whistle of any kind before the crash. Engineer had received several past warnings from his employer, Railco, for operating trains recklessly. Allstate Railroad, the owner of the tracks, had been notified earlier that day that the crossing gates were malfunctioning and not closing as trains approached. A statute requires a railway company whose track is crossed by a public way to guard and protect its track "by plank, timber or otherwise" to secure a safe passage across its tracks.

Bob was taken to Memorial Hospital where he was treated for life threatening injuries. He was given "Cure-all", an experimental drug made by Drug Company. During surgery performed by Doctor, Bob had an allergic reaction to "Cure-all" causing him further injuries. Doctor also "nicked" an artery causing excessive bleeding. Bob was hospitalized for several months and unable to return to work or resume his normal activities.

What are the rights of the parties?

      7.     Al and Bill were roommates at State U.  Al was a United States citizen and, although Bill had lived most of his life in the United States, he was not an American citizen. Following a chemistry class which the two attended along with about 25 other students, a small amount of a highly toxic chemical was discovered to be missing.  Federal investigators interviewed all the students and received permission from State U. to search the students' rooms including their personal computers which had been loaned by State U. to each student at the beginning of the term.

      Based on the investigation, as well as reports of unidentified students living in the same dormitory as Al and Bill, both were accused of being terrorist sympathizers who had stolen the toxic material for use in making a terrorist bomb.  Neither Al nor Bill had any criminal record, both were honor students majoring in chemistry and each steadfastly denied taking the material or being involved with any terrorist groups.

      Nevertheless, Al and Bill were transported to a Federal detention facility where, they were told, they would remain indefinitely without being charged with a crime. Both were further classified by the government as "enemy combatants."  Both Al and Bill requested legal counsel and were told that neither had a right to a lawyer. Eventually, Al's sister managed to convince Partner at MegaFirm to represent Al and Partner did so without compensation from Al; MegaFirm paid Partner's expenses incurred in the representation.

      Partner filed a *habeas corpus* petition on Al's behalf and the government responded that the Constitution does not guarantee a right to *habeas corpus* and, in any event, it was unavailable to persons designated as enemy combatants.  Shortly before the hearing on *habeas corpus* petition, Corporation, one of MegaFirm's largest clients, was notified by Official, a high ranking government lawyer, that Partner, who had frequently represented Corporation, was representing a known terrorist and attempting to have him released from custody.  Corporation asked that Partner no longer represent it.

      Partner has asked you to prepare a memo addressing the following issues:

A.  Does Bill, a non-US citizen, have a right to counsel?

B.  Are there other legal arguments you can raise on behalf of Al and Bill?

C. Is a *habeas corpus* petition filed on behalf of either Al or Bill likely to be successful and why?

D. What issues are raised and on what basis by Official's notification to Corporation about Partner's representation of Al?

8. Hiram and Willa were married. While dining at a restaurant one evening, they began to quarrel and in anger Willa told Hiram that she was having an affair with another man. Shocked and enraged, Hiram struck Willa on the head with a wine bottle from their table, killing her. Hiram then fled from the restaurant to his brother Bill's house. Hiram told Bill what had happened and Bill gave his car and some money to Hiram, who then left in the car. As Hiram was driving away, he was stopped by a police officer for speeding. The police officer recognized Hiram from an "all points bulletin" that had been issued, arrested him and brought him to the police station for booking.

Frank, Willa's father, learned of his daughter's death and rushed to the police station, armed with a handgun. Seeing Hiram there, he drew the gun and fired it at Hiram, missing him and instead striking Polly, a police officer, and killing her. Frank was arrested and taken into custody.

Both Hiram and Frank were held without bail at the county house of correction to await trial. There, Frank approached Don, a correctional officer, and offered to pay him $50,000 to kill Hiram. Don agreed and later asked Ed, another officer, to help him by acting as a lookout, and Ed agreed to participate for half the payment. The following night, Don and Ed went to Hiram's cell block where, outside of Hiram's cell, Ed told Don that he couldn't go through with it and left. Alone, Don entered Hiram's cell with a knife in hand. As he tried to stab Hiram, Hiram woke up and began to struggle with Don, eventually taking the knife from him. Gloria, another officer, heard the commotion and rushed to Hiram's cell where she saw Hiram standing over Don with the knife in his hand. Gloria drew her revolver and shot Hiram in the shoulder. Hiram later recovered from his wound.

What crimes have been committed, what defenses may be raised, and by whom?

9. John died 30 years ago. In his validly executed will he bequeathed fifteen valuable paintings to the Trustees of a Massachusetts charitable trust. John's bequest also provided:

> 1. If at any time in the future there exists a public art museum in the Massachusetts town of Village, the Trustees shall loan the paintings to such art museum without charge for purposes of exhibition. Otherwise, the paintings shall be loaned by the Trustees to the City Art Museum ("CAM") without charge for purposes of exhibition.
>
> 2. The ownership and control of the paintings shall be vested permanently and inalienably in trust in the Trustees and their successors. It is my strong wish that all of the paintings will be displayed to the public at all times.
>
> 3. My purpose in making this bequest is to create and gratify a public taste in fine art, particularly among the residents of Village. I give to the Trustees full and absolute authority in any contingency not fully provided for in the above provisions to take such action as they judge best fitted to serve the purpose described.

John bequeathed the remainder of his estate to his son Chris.

As no public art museum has ever existed in Village, for the last 30 years the Trustees have loaned the fifteen paintings to CAM. CAM regularly exhibited four of them and safely stored the other eleven paintings for display to the public upon request.

Last month, the New Art Museum ("NAM"), a newly built public art museum in a town next to Village, asked the Trustees to loan it all of the paintings for exhibition without cost. Also last month, the Village local government asked the Trustees to loan all of the paintings without cost to Village for exhibition in its public schools. Finally, last month Chris asked the Trustees to give to him the eleven paintings that CAM has been storing on the grounds that the Trustees have failed to provide for their regular public exhibition.

The Trustees voted to reject all three of these requests. The Trustees also voted to sell all fifteen of the paintings and use the money raised by these sales to fund college scholarships for Village students interested in the arts and to pay Trustee administrative expenses.

What are the rights of Trustees, CAM, NAM, Village local government, and Chris?

10. Heatco, a Massachusetts corporation, sold furnaces manufactured by others. Builder, a real estate developer, was constructing an addition to Mansion, his own home, and purchased a replacement furnace from Heatco. Mansion was vacant during construction. Builder provided Heatco with the construction plans showing the new, total square footage of his expanded house. Builder asked Heatco for a furnace that would adequately heat Mansion and further suggested that Heatco obtain a furnace manufactured by Acme based upon Builder's familiarity with Acme's products. Builder's written agreement with Heatco contained the following clause:

> DISCLAIMER OF WARRANTIES
> Heatco warrants that the furnace and component parts will be free from defects in materials and workmanship and will make any necessary repairs for a one year period. Heatco disclaims all other warranties, express or implied.

Heatco contacted Acme noting in writing the total square footage of Builder's expanded home. Acme then supplied Heatco with a furnace for Builder's house. For a variety of reasons, construction of the addition was delayed and Builder decided not to move into Mansion and listed it for sale along with several other properties he was building. In January, six months after the installation of the Acme furnace, construction of Mansion was completed. Builder, who had not sold Mansion, complained to Heatco that the furnace was inadequate to heat Mansion. Heatco visited Mansion several times for repairs within the one year period, which has expired, but the furnace still did not heat the entire house. Builder never moved into Mansion and claimed that he sold the house to Kathy, after full disclosure of the problems with the furnace, for less than its market value because of the problems with the furnace.

What are rights of the parties?