# MASSACHUSETTS BAR EXAMINATION

**SECOND DAY**               **JULY 26, 2007**               **ESSAY SECTION**
                         **MORNING PAPER**
                           **QUESTIONS**

1.      Ben usually spent his nights at Hope House, a homeless shelter in City. On his way to
Hope House one night, Ben stopped at Convenience Store. Tom, Convenience Store's manager,
followed Ben as he walked down the aisles. Ben stuffed a can of soda and a candy bar in his
jacket pockets, and as he began to leave the store, Tom grabbed Ben by the jacket collar. Ben
whirled and swung at Tom's head. Tom fell backward, hit his head on the floor breaking his
neck and died instantly. Jane, who was putting gas in her car at Convenience Store's pumps,
watched as Ben began running from the store. Ben ran toward Jane, pushed her to the ground,
jumped into Jane's car and drove away. Jane's car contained her designer purse valued at $225,
and her infant daughter, Elsie, who was in a car-seat in the backseat of the car. When Ben saw
Elsie, he stopped the car, grabbed the purse and ran. The purse contained $100 cash and credit
cards.

        Jim, an off-duty City police officer, volunteered at Hope House by driving the shelter's
van to pick up homeless people in City. Jim carried his gun in accordance with the City police
department's regulation which required officers to carry their firearms at all times. Earlier that
night, Jim heard a radio report that Convenience Store's manager had been killed. Ben was
sleeping on a park bench when Jim approached him in the van. Jim asked Ben why he was
sleeping outside on such a cold night. Ben mumbled something that Jim did not understand. Jim
told Ben to get into the van but Ben refused. Jim then exited the van, took Ben by the arms and
forced Ben into the van. When Ben was in the van, Jim asked what Ben had done that night.
Ben blurted out "I'm a thief, not a killer, I never hurt nobody." Jim locked the van's doors but
Ben, in a frantic effort to escape, struck Jim on the head, smashed a van window and opened the
van door from the outside and ran away. Jim ran after Ben and grabbed his lower legs, causing
Ben to fall. Jim drew his gun, pointed it at Ben and again asked Ben what he had done that
night. Ben responded "So, I'm a thief. I'm not a killer. I never hurt nobody. But he grabbed
me first." Jim then read Ben his <u>Miranda</u> rights and took him to the police station.

Dunne v. Massachusetts Board of Bar Examiners

Doc. 9 Att. 1

What crimes have been committed by Ben?

What rights and defenses may Ben assert and with what success?

2.    Hal and Wendy were divorced in 2004. Pursuant to the judgment entered by the Probate and Family Court trial judge, (a) Hal and Wendy were granted joint legal custody of their minor children, Sam and Denise; (b) Wendy was granted physical custody of both children; (c) Hal was granted reasonable rights of visitation with the children, including scheduled weekdays and alternate weekends; and (d) Hal was ordered to pay child support to Wendy.

In December, 2006, Andrew, a man with whom Wendy had maintained a relationship for the past year, moved in with Wendy and the children and began to contribute equally to all of Wendy's household expenses. Hal objected to Andrew's and Wendy's relationship and to their living together, believing that it would have an adverse effect on the children. Hal's parents also voiced their disapproval, and Wendy thereafter refused to allow the children to have any further contact with Hal's parents.

Recently, Wendy met with Hal and told him that she intended to relocate with Andrew and the children to Ohio, where her parents lived and she had found a better job and where the children would be able to attend very good private schools. Upon hearing of Wendy's plans, Hal became furious and made a threatening gesture to her with his fist, telling her that he would "get her for doing this to him."

Hal has just learned that Denise may not be his biological daughter but rather the daughter of Bill, a man with whom Wendy had had an affair during their marriage. Hal no longer wishes to pay child support for Denise and, in addition, he believes that he is paying too much child support for Sam. He also objects to Wendy's proposed move to Ohio, which will greatly impact his visitation rights and impose a significant financial burden on him, and he would like to have Sam come to live with him, rather than move. Sam, who is now eleven years old, also wants to live with his father and not move to Ohio. Hal's parents object to Wendy's refusal to permit them to see the children. Wendy is concerned about her personal safety in view of the threat made by Hal.

What are the rights of the parties?

3.    Pat decided to purchase a laptop computer for her use in the kitchen and to bring on family trips with her children. On June 20, 2005, Pat went to Store, which specialized in computers, and asked for a recommendation for a lightweight and durable computer for home and travel use. The laptop computer (Laptop) recommended by Store cost more than Pat expected and Store's Manager asked Pat whether she wanted Store to finance the purchase. Pat agreed and Store loaned Pat $4,500 for the purchase of the Laptop. Pat signed Store's standard security agreement which described the Laptop and Pat left Store with the Laptop. Store did not file a financing statement.

Pat loved the Laptop and soon realized that it was far more efficient for her job as an independent sales consultant than her existing desktop. She started taking the Laptop to her office and used it almost exclusively for business purposes. She did not inform Store about this change of use. Pat's business grew and she obtained a $50,000 loan from Bank as operating capital, agreeing that Bank could have a security interest in all of her office equipment, including the Laptop she had purchased from Store. On October 1, 2005, Pat signed the security agreement Bank had requested and prepared and Bank duly filed a valid financing statement.

Pat defaulted on both her loan from Store and from Bank. On April 1, 2006, Store repossessed the Laptop. Both Store and Bank claim a security interest in the Laptop.

What are the rights of the parties?

- 4 -

4.    The Medical School at State University ("School") decided in early 2005 to adopt an admissions policy that provided:

> (A) Given that five percent of the State's citizens are Native American, School must ensure that no fewer than five percent of the enrolled first year class shall be Native American.
>
> (B) Given that the State's African Americans citizens have suffered great historical discrimination, all African American applicants will have their college grade point averages increased by twenty percent prior to the consideration of their applications by School's admissions committee.
>
> (C) With respect to all other applicants coming from racial or national origin minority groups that have been historically underrepresented at School, an applicant's race or national origin may be considered by School's admissions committee as a "plus" in a particular applicant's file.
>
> (D) Given the importance of traditional music to all minority groups, all applicants who are accomplished musicians will have their college grade point averages increased by twenty percent prior to the consideration of their applications by School's admissions committee.

The application by John, who was white and not a musician, to attend School was rejected in 2006, even though he had a higher college grade point average than many of the minority applicants who were offered admission by School that year. John filed suit claiming that School's admissions policy was illegal, and a few months later moved for summary judgment.

Town had an ordinance making it a misdemeanor to engage in door-to-door solicitation without first securing a permit from Town. Bill heard about John's lawsuit, and decided to go door-to-door in Town passing out a handbill stating that School had a racist admissions policy. The back side of the handbill had a small advertisement for Bill's pizza parlor. Town police arrested Bill for violating the ordinance. Bill moved to dismiss the charges.

How should the court rule on John's summary judgment motion? How should the court rule on Bill's motion to dismiss?

5.      Jack and Carol played golf one afternoon at Golf Course. While playing, Carol accidentally hit some golf balls onto adjacent private property owned by Oscar.  Jack and Carol walked to the edge of Oscar's property attempting to visually locate Carol's golf balls.  Spotting one of her golf balls under a shrub, Carol walked onto Oscar's property to retrieve the ball. Oscar, who had been gardening when he saw Carol on his property, rushed over towards Carol, carrying a large shovel and yelling: "Get off my property right now or I'll fix you!"  Carol immediately started to run away and tripped over a rusted barrel Oscar had left at the edge of his property.  Carol fell and was unable to get up. Jack immediately called 911 on his cell phone.

While waiting for the ambulance to arrive, Jack took some practice swings with his new golf club, designed and manufactured by Acme.  Acme had specially designed the golf club so that the mid-point of the club shaft was very flexible.  During one of his practice swings, Jack's club struck a rock, breaking the shaft and sending pieces flying into Jack's arm and leg causing deep cuts and permanent injury.  The golf club shattered exactly at the mid-point of the shaft.

After Jack bought the golf club and before his accident, Acme became aware that several golf club shafts had broken at the same mid-point where Jack's club had shattered.  As a result, Acme changed the design of the golf club by installing a small device in the mid-point of the shaft at minimal cost.  There have been no complaints about broken golf club shafts in the redesigned models.

What are the rights of the parties?

**MASSACHUSETTS BAR EXAMINATION**

**SECOND DAY**                **JULY 26, 2007**                **ESSAY SECTION**
                            **AFTERNOON PAPER**
                            **QUESTIONS**

6.     Ed was charged with assault and battery with a dangerous weapon for stabbing his girlfriend, Mary, during an argument about Mary's relationship with her co-worker, Ted. Early on April 22, Ann, who lived down the hall from Ed, heard loud voices coming from Ed's apartment and heard Ed shout: "This will teach you not to fool around!" Ann then heard the sound of doors slamming from Ed's apartment. An ambulance arrived shortly thereafter and Paramedic found Mary lying alone on the floor bleeding profusely from a stab wound in her side. Mary said to Paramedic, "If I don't make it, don't let Ed get away with this. He's not going to hurt me anymore." While being treated at the hospital, Mary told Physician that Ed stabbed her repeatedly during an argument. Later, while still hospitalized, Mary signed a police witness report prepared by Officer stating that she had been attacked and stabbed by Ed during a fight in his apartment on April 22.

By the time Ed's case was called for trial in the Superior Court, Mary and Ed had reconciled. The prosecution called Mary to testify. During Mary's testimony, she denied that Ed had stabbed her, and she also denied that she had ever told anyone that Ed had stabbed her.

Following Mary's testimony, the following evidence was offered for admission:

1.     **By the prosecution,** the testimony of Ann that she heard Ed shout: "This will teach you not to fool around!"

2.     **By the prosecution,** the testimony of Paramedic that Mary told her, "If I don't make it, don't let Ed get away with this. He's not going to hurt me anymore."

3.     **By the prosecution,** the Grand Jury testimony of Physician that Mary told him that Ed stabbed her during an argument.

4.    **By the prosecution,** the police witness report signed by Mary and containing Mary's statement to Officer stating that Ed had attacked and stabbed her during a fight in his apartment.

5.    **By the prosecution,** Ed's felony conviction for assault and battery upon a former girlfriend in 2004 which is still pending on appeal.

6.    **By Ed's counsel,** the testimony of Donna, an acquaintance of Mary and a friend of Ed, that Mary had a reputation for not telling the truth and for making stories up to get attention.

7.    **By the prosecution,** Mary's hospital records for treatment of bruises received several weeks before she was stabbed, which contained the following statement made by Mary to a nurse: "I'm tired of being pushed around by men. I've had enough of it. I'm a mess, just look at me."

**A proper objection was made for each item of evidence. How should the court rule on each objection?**

8.    **By the prosecution,** the testimony of Sally, a licensed counselor at the Center, a safe-house for abused women, about statements made by Mary during Center visits concerning Mary's fear of Ed and what he might do to her if she attempted to end the relationship. Sally moved to quash her subpoena, claiming that her communication with Mary at the Center was privileged and refusing to testify. Mary's lawyer also moved to quash Sally's subpoena.

**How should the court rule on the motions to quash?**

7.     Ted and Margaret divorced in 1990. Margaret continued to live in the condominium in City which they had purchased during their marriage as tenants by the entirety and which they still owned together. Ted and Margaret also owned together 1,000 shares of stock in Beta Corp., which they had acquired during their marriage as joint tenants.

Ted had two brothers, Edward and Frank, and a sister, Sarah. He had no contact with his and Margaret's only child, Danielle.

Ted executed a will in 1998, witnessed by his lawyer and by Sarah's husband, which provided in part as follows:

*I.  I give the sum of $100,000 to Andrew (my personal assistant) and Belle (my secretary and Andrew's wife) in gratitude for their loyal service to me.*

*II.  I give my one-half interest in the Beta Corp. stock and my one-half interest in my condominium in City to my sister, Sarah, if she survives me, otherwise to her son, Henry.*

*III.  I give the sum of $1.00 to my daughter, Danielle.*

*IV.  I give the rest, residue and remainder of my estate to my brothers, Edward and Frank.*

In 2000, Ted gave Andrew an envelope which contained a life insurance policy naming Andrew as beneficiary and a letter instructing him to hold the insurance proceeds in trust to care for Ted's dog and cat, for as long as they lived. Ted also handed Andrew a duly executed deed to his house in Town, which named Andrew as grantee. Ted then took the deed back and placed it in his safe. He gave Andrew the combination to the safe and told him to record the deed after his death.

Belle died a year later, and Andrew thereafter quit his job as Ted's personal assistant. Ted then drew a line through the names of Andrew and Belle in his will and wrote in the name of Charity, a public charity. This change was not witnessed.

Frank died in 2003, survived by a son, Gerald. In 2005, after an argument with Edward, Ted crossed out Edward's name in his will. This change also was not witnessed.

Ted died in October, 2006, and Margaret died a month later, without a will. Andrew has obtained the deed to Ted's house from his safe and recorded it in the

Registry of Deeds. He has also stated that he will not care for Ted's dog and cat, but instead intends to keep the proceeds of Ted's life insurance policy for himself.

What are the rights of the parties to the assets of Ted and Margaret?

8.     Collector owned a rare antique bowl which needed some repairs. In August, 2006, Collector brought the bowl to Dealer, who repaired and sold antiques. Dealer agreed to repair the bowl for $2,500 and to return it to Collector in 30 days. Dealer required either full payment in advance or the execution of a promissory note before he would begin any repair work. Collector signed a negotiable promissory note in the amount of $2,500 payable to Dealer no later than October 1, 2006.

Dealer repaired the bowl but did not return it to Collector. In mid-September, 2006, Dealer sold it to Museum. At the time of the sale, Museum was examining other antiques in Dealer's store and believed that the bowl belonged to Dealer.

Collector's note became due on October 1, 2006 but she refused to pay Dealer because Dealer had not returned the bowl to her. Collector did not know that Dealer had sold the bowl to Museum.

On October 7, 2006, Dealer sold Collector's promissory note to Financier for $2,000. Dealer did not tell Financier anything about the bowl or Collector or Museum. Dealer endorsed the note to Financier, writing in large letters "without recourse" above the endorsement. Thereafter, Financier presented the note to Collector and demanded payment but Collector refused to pay.

Collector has learned that Dealer sold the bowl to Museum for $75,000. Despite repeated requests from both Dealer and Collector, Museum has refused to return the bowl to Collector.

What are the rights of the parties?

9.     Sarah filed suit in January 2007 in US District Court in Boston against the Berlin Widget Company ("Berlin") and Hans (Berlin's President). Sarah claimed in her Complaint that several male United States co-workers and Hans (who lived and worked in Germany) sent her many sexually offensive emails in October and December 2006.

During the lawsuit, certain motions were presented to the Court:

1. Sarah served the Complaint and Summons in February 2007 by certified mail on Berlin at its Massachusetts office and by certified mail on Hans at his German home. Berlin and Hans moved to dismiss the Complaint for inadequate service of process. Before the Court could rule on this motion, Sarah had a deputy sheriff in late February 2007 personally serve Berlin and Hans in Boston.

2. Berlin and Hans filed their Answers in March 2007. Three days later, Sarah filed a demand for trial by jury, which Berlin and Hans moved to strike.

3. Sarah served a document request in May 2007 on Berlin demanding copies of all email messages sent to her that contained certain obscene words that she listed. Berlin replied to this request by producing a few emails from December 2006 and by stating that all such emails from October 2006 were recently destroyed pursuant to the company's document retention policy whereby old email messages must be deleted from all of Berlin's computers after 6 months in order to save on computer memory space. Sarah then anonymously received in the mail a copy of a February 2007 internal Berlin memo from Berlin's General Counsel to several high level Berlin employees instructing them to aggressively seek out and destroy all obscene emails in Berlin's computer system. Sarah moved for sanctions against Berlin and its General Counsel.

4. In June 2007, Berlin and Hans moved to amend their Answers to add laches as a new affirmative defense.

5. Twenty five days after judgment was entered against her in July 2007, Sarah filed a Notice of Appeal in the Clerk's office of the US District Court in Boston. Berlin and Hans moved to strike this Notice on the grounds that it was not effectively filed.

How should the Court rule on these motions?

- 12 -

10.     Oceanside, a 30 acre parcel of undeveloped waterfront property located in Town, was owned by Anne. Anne enjoyed Oceanside and would often walk along the shore and picnic with her family. In April, 1993, by a properly recorded deed, Anne conveyed Oceanside to Bert for consideration. In the deed, Anne reserved to herself, her heirs and assigns:

> "The right to pass and re-pass over said property, to fish from the rocks and generally enjoy the benefits and natural beauty of said property."

In 1998, again by a properly recorded deed, Bert conveyed Oceanside to Charlie who divided Oceanside into 20 one-acre lots; Charlie retained a ten-acre lot for himself. For valid consideration, Anne released the reservation contained in the April, 1993 deed but only as to the 20 one-acre lots.

Charlie then sold the 20 one-acre lots to various individuals by quitclaim deeds, each of which contained the following restrictions:

> (1) construction on each lot shall be limited to one single family residential dwelling no larger than 4,000 square feet;
>
> (2) the height of any residential dwelling shall be limited to insure existing water views from other lots and the effect of the dwelling on all the other lots.

Anne died in 1999. Anne's heirs have enjoyed visiting Oceanside annually, using a small dirt path on Charlie's ten-acre lot and picnicking overlooking the ocean.

In 2007, Charlie began building a 5,000 square foot home on his ten-acre lot. If constructed as planned, Charlie's home, at its tallest point, would be 120 feet, more than double the height of any other structure on the remaining 20 one acre parcels. Danny, owner of a one-acre lot purchased from Charlie, sought to enforce the square footage and height restrictions against Charlie, claiming that Charlie's home will block a portion of his ocean view. Anne's heirs also sued to block the construction of Charlie's home, claiming that the reservation retained by Anne precludes the construction of any dwelling or improvements whatsoever on Charlie's ten-acre lot.

What are the rights of the parties?

- 13 -

## MASSACHUSETTS BAR EXAMINATION

**SECOND DAY**              **MARCH 1, 2007**              **ESSAY SECTION**
                          **MORNING PAPER**
                            **QUESTIONS**


1.      Olsen died testate in 1995 and left Blackacre, a house and several acres of land located in Town, to his two sons, Al and Bob "for their joint lives and then to the survivor". Al resided at Blackacre for the past ten years and has paid the taxes during this period. Bob conveyed his interest in Blackacre to Charles in 1999.

Al listed Blackacre for sale with a licensed Broker for $1 million dollars. Broker negotiated with Paul, to buy Blackacre. On November 1, 2006, Al entered into a written contract with Paul to sell him Blackacre for $900,000, and Paul gave Al a $200,000 deposit. The closing was scheduled for February 2, 2007. Al also agreed to pay Broker a 10% commission for negotiating the sale.

On December 1, 2006, Town took 20% of Blackacre by eminent domain. Al died on December 10, 2006 and left a will giving his realty interests to his friend Jim and his personal property to Al's three surviving children.

On December 15, 2006, Paul notified Fred, the executor of Al's estate, that he would not buy Blackacre and demanded a refund of the $200,000 deposit. Fred has refused Paul's demand to return the deposit. Broker has demanded that Fred pay him the 10% commission.

What are the rights of the parties?

2.     Consumer brought a class action lawsuit in the United States District Court in Boston alleging that the defendant, Dryer, had manufactured clothes dryers with defective heating coils. Consumer's complaint identified the class members as 60,000 individuals in New England who had bought the dryers between 2000-2004 and had suffered losses as a result of the defective coils which could catch fire quickly causing both personal injury and property damage. The alleged losses ranged from a $100 cost to replace the defective coils to serious personal injury and property damage.

Consumer's claim involved the $100 coil replacement cost Consumer's complaint alleged that federal jurisdiction was based on a breach of warranty claim under a recently passed federal consumer product safety statute.

Consumer sought to certify the class and Dryer objected claiming that there were many other lawsuits by individual Dryer owners alleging extensive personal injuries and/or property damage as a result of Dryer's defective coils during the years in question. Dryer also noted that a nearly identical class action against Dryer based on state law warranty claims was presently pending in another State. That action, in which Consumer was also among the lead plaintiffs, sought relief similar to the Massachusetts federal action and sought to represent essentially an identical class of plaintiffs. The plaintiffs in both cases were represented by the same small law firm of newly admitted lawyers who had not previously represented parties in class actions. In its opposition to Consumer's motion for federal class certification, Dryer moved to dismiss the federal case because of the pending State class action.

While Consumer's and Dryer's motions were pending and before the Court ruled, Consumer hand delivered a deposition notice to Dryer demanding that Dryer's President appear for a deposition. Dryer moved for a Protective Order claiming that its "officers, directors and managing agents" were beyond the subpoena power or other authority of the Court.

How should the Court rule on the pending motions?

3.     David was charged with vehicular homicide of Vance, a pedestrian. Vance had been out walking with his wife, Whitney, when he was struck and killed by a motor vehicle allegedly driven by David. At David's trial in the Massachusetts Superior Court, the following occurred:

(a) On direct examination by the Commonwealth, Whitney testified over David's objection that she observed the white van which struck and killed Vance traveling at a rate of speed in excess of 80 miles per hour.

(b) On direct examination by the Commonwealth of Officer, a police officer, the Commonwealth offered Officer's police report, which was admitted in evidence over David's objection. The report included the following statements:

> (1) "I arrived at the crime scene only minutes after the incident. There I encountered Whitney, who stated: 'Oh my God, my husband was just struck by a white van. It was David's van; I'd know it anywhere.'"

> (2) "As a result of my investigation, it is my opinion that David was the driver of the white van which struck Vance."

(c) On direct examination by the Commonwealth, Sally, David's fourteen year old daughter who lived with David, testified over David's objection that David had told her that he had been driving the white van which struck and killed Vance.

(d) On direct examination by the Commonwealth, Minister, an ordained minister at David's church, testified over David's objection that David had visited her at her home a week after the incident and told her: "I did something terribly wrong. Can I ever be forgiven?"

(e) On direct examination by David, Albie, a friend of David, testified that at the time of the incident, David was at his house playing poker. Thereafter, on cross-examination, the Commonwealth offered certified copies of the following documents, which were admitted in evidence over David's objections:

(1) The record of Albie's conviction for attempted murder eleven years earlier for which he had received a sentence in state prison.

(2) The record of Albie's conviction for disturbing the peace six years earlier for which he received a suspended sentence.

(f)  On further cross-examination, Albie was shown a check for $1,000 written to him by David just before trial and then was asked whether David had paid him to testify about David playing poker at his house.  Thereafter, on redirect examination, David offered Albie's written statement given to the police two weeks after the incident, which substantiated the testimony he had given on direct examination.  The statement was admitted over the Commonwealth's objection.

In each instance, were the trial judge's rulings correct?

4.    Mary and Jane, both attorneys, were married two years ago in Massachusetts. The day before their marriage, Mary and Jane each fully disclosed their assets to the other and signed an antenuptial agreement (the "Agreement") in which each of them agreed that if they were ever divorced (i) they would divide any joint marital property evenly, (ii) they would not seek or accept any property that the other brought into the marriage, and (iii) they would not seek or accept child support or alimony from the other. The Agreement was drafted and reviewed by an attorney representing Jane. Mary did not hire an attorney to review the Agreement as she "trusted Jane."

At the time of the marriage Jane had a two year old adopted child, Philip, and Mary was three months pregnant. When Mary gave birth in Boston six months later to Charles, Mary and Jane were listed on his birth certificate as his parents. Mary has treated and referred to Philip as her son, although she did not adopt him. Mary, Jane, Philip and Charles lived in a house in Boston owned by both Mary and Jane. The down payment for this house came only from Mary.

Jane was the sole supporter of the family, while Mary stayed at home taking care of Philip and Charles. Mary had no savings, while Jane had over a million dollars in savings from an inheritance that she received when her mother died three years ago.

Yesterday Jane got drunk and hit Mary with a baseball bat, breaking Mary's leg, when she learned that Mary was having an affair with Lisa. As a result, Mary decided to end her marriage with Jane in order to live in her house with Philip, Charles, and Lisa.

What are the rights of Mary and Jane?

5.     Hockey, Inc. ("Hockey"), a Massachusetts corporation, owned and operated hockey rinks. Hockey was wholly owned by Bill and his sister, Sue, who were Hockey's sole directors, officers and shareholders.  Hockey acquired several Massachusetts hockey rinks and created separate subsidiary corporations to operate each rink. Bill and Sue were the directors and officers of each of the subsidiary corporations, one of which was called Hockey North, Inc. ("North"). Hockey and the subsidiary corporations had their principal offices at the same address, and the same person managed all of the businesses. Bill participated in the operation of all of the corporations and regularly sent out memoranda on "Hockey" letterhead to the various managers of the hockey rinks concerning rink policy and operations. Bill transferred money to and from his personal account to Hockey's account to pay Hockey's expenses.

Ed was employed by North and worked at one of the rinks. One Friday, during lunch, Ed drove to Hockey's corporate offices in his own vehicle to pick up payroll checks for himself and two co-employees and to attend a company meeting called by Bill.  While driving to the offices, Ed lost control of his vehicle striking Claire and seriously injuring her. Shortly after the accident, North became insolvent and ceased doing business.

While working for Hockey, Sue learned of a hockey rink that was for sale in western Massachusetts. Sue had several meetings with the owner of the rink. As negotiations proceeded, Sue, without telling Bill, asked Hockey's Attorney to create a corporation so that Sue could acquire the rink in western Massachusetts, Sue asked Attorney not to tell Bill about this transaction. Attorney complied with Sue's request, creating a new corporation called Western, Inc. ("Western") and making Sue the sole director, officer and shareholder. Sue acquired the rink in Western's name and its operation has been very profitable.

What are the rights of the parties?

# MASSACHUSETTS BAR EXAMINATION

**SECOND DAY**                    **MARCH 1, 2007**                    **ESSAY SECTION**
**AFTERNOON PAPER**
**QUESTIONS**

6.      Bob lived with Jane in an apartment building called Gardenside, owned by Realty and managed by Stan, the resident superintendent. Bob was late for a meeting and decided to leave the building by the stairs. Although the stairway was dark because several light bulbs had burned out, Bob skipped every other step while talking on his cell phone. He fell on the stairway over a toy left on the landing by Child, age 4, who lived at Gardenside with his parents, Frank and Maggie. Bob injured his neck and back. Other residents of Gardenside had complained to Stan about toys being left on the stairway.

Bob got up and hurried to his car, planning to have a doctor check his injuries later. He got into his car and turned on the radio and air conditioner. While leaving the parking lot at Gardenside, Bob talked on his cell phone. He did not use his seatbelt. As Bob approached a railroad crossing, he slowed down and looked to his left. Bob's view to the left was blocked because Tim, a truck driver for Furniture Company, had parked its truck by its store in a "No Parking" zone while the delivery crew took a break. Furniture Company had received parking tickets in the past for parking its truck illegally.

Bob looked to his right and then seeing that the railroad crossing gates were open, he proceeded in his car across the railroad tracks. As he crossed the tracks, he was surprised to see a train, operated by Engineer, coming toward him from the left and out from behind Furniture Company's truck. Bob froze on the tracks unable to move. The train crashed into Bob's car, pushing it several hundred yards down the track and into a ditch.

Witnesses at the scene stated that they did not hear any signal or whistle of any kind before the crash. Engineer had received several past warnings from his employer, Railco, for operating trains recklessly. Allstate Railroad, the owner of the tracks, had been notified earlier that day that the crossing gates were malfunctioning and not closing as trains approached. A statute requires a railway company whose track is crossed by a public way to guard and protect its track "by plank, timber or otherwise" to secure a safe passage across its tracks.

Bob was taken to Memorial Hospital where he was treated for life threatening injuries. He was given "Cure-all", an experimental drug made by Drug Company. During surgery performed by Doctor, Bob had an allergic reaction to "Cure-all" causing him further injuries. Doctor also "nicked" an artery causing excessive bleeding. Bob was hospitalized for several months and unable to return to work or resume his normal activities.

What are the rights of the parties?

7.    Al and Bill were roommates at State U. Al was a United States citizen and, although Bill had lived most of his life in the United States, he was not an American citizen. Following a chemistry class which the two attended along with about 25 other students, a small amount of a highly toxic chemical was discovered to be missing. Federal investigators interviewed all the students and received permission from State U. to search the students' rooms including their personal computers which had been loaned by State U. to each student at the beginning of the term.

Based on the investigation, as well as reports of unidentified students living in the same dormitory as Al and Bill, both were accused of being terrorist sympathizers who had stolen the toxic material for use in making a terrorist bomb. Neither Al nor Bill had any criminal record, both were honor students majoring in chemistry and each steadfastly denied taking the material or being involved with any terrorist groups.

Nevertheless, Al and Bill were transported to a Federal detention facility where, they were told, they would remain indefinitely without being charged with a crime. Both were further classified by the government as "enemy combatants." Both Al and Bill requested legal counsel and were told that neither had a right to a lawyer. Eventually, Al's sister managed to convince Partner at MegaFirm to represent Al and Partner did so without compensation from Al; MegaFirm paid Partner's expenses incurred in the representation.

Partner filed a *habeas corpus* petition on Al's behalf and the government responded that the Constitution does not guarantee a right to *habeas corpus* and, in any event, it was unavailable to persons designated as enemy combatants. Shortly before the hearing on *habeas corpus* petition, Corporation, one of MegaFirm's largest clients, was notified by Official, a high ranking government lawyer, that Partner, who had frequently represented Corporation, was representing a known terrorist and attempting to have him released from custody. Corporation asked that Partner no longer represent it.

Partner has asked you to prepare a memo addressing the following issues:

A. Does Bill, a non-US citizen, have a right to counsel?

B. Are there other legal arguments you can raise on behalf of Al and Bill?

C. Is a *habeas corpus* petition filed on behalf of either Al or Bill likely to be successful and why?

D. What issues are raised and on what basis by Official's notification to Corporation about Partner's representation of Al?

8.    Hiram and Willa were married. While dining at a restaurant one evening, they began to quarrel and in anger Willa told Hiram that she was having an affair with another man. Shocked and enraged, Hiram struck Willa on the head with a wine bottle from their table, killing her. Hiram then fled from the restaurant to his brother Bill's house. Hiram told Bill what had happened and Bill gave his car and some money to Hiram, who then left in the car. As Hiram was driving away, he was stopped by a police officer for speeding. The police officer recognized Hiram from an "all points bulletin" that had been issued, arrested him and brought him to the police station for booking.

Frank, Willa's father, learned of his daughter's death and rushed to the police station, armed with a handgun. Seeing Hiram there, he drew the gun and fired it at Hiram, missing him and instead striking Polly, a police officer, and killing her. Frank was arrested and taken into custody.

Both Hiram and Frank were held without bail at the county house of correction to await trial. There, Frank approached Don, a correctional officer, and offered to pay him $50,000 to kill Hiram. Don agreed and later asked Ed, another officer, to help him by acting as a lookout, and Ed agreed to participate for half the payment. The following night, Don and Ed went to Hiram's cell block where, outside of Hiram's cell, Ed told Don that he couldn't go through with it and left. Alone, Don entered Hiram's cell with a knife in hand. As he tried to stab Hiram, Hiram woke up and began to struggle with Don, eventually taking the knife from him. Gloria, another officer, heard the commotion and rushed to Hiram's cell where she saw Hiram standing over Don with the knife in his hand. Gloria drew her revolver and shot Hiram in the shoulder. Hiram later recovered from his wound.

What crimes have been committed, what defenses may be raised, and by whom?

What are the rights of Trustees, CAM, NAM, Village local government, and Chris?

10.    Heatco, a Massachusetts corporation, sold furnaces manufactured by others. Builder, a real estate developer, was constructing an addition to Mansion, his own home, and purchased a replacement furnace from Heatco. Mansion was vacant during construction. Builder provided Heatco with the construction plans showing the new, total square footage of his expanded house. Builder asked Heatco for a furnace that would adequately heat Mansion and further suggested that Heatco obtain a furnace manufactured by Acme based upon Builder's familiarity with Acme's products. Builder's written agreement with Heatco contained the following clause:

> **DISCLAIMER OF WARRANTIES**
> Heatco warrants that the furnace and component parts will be free from defects in materials and workmanship and will make any necessary repairs for a one year period. Heatco disclaims all other warranties, express or implied.

Heatco contacted Acme noting in writing the total square footage of Builder's expanded home. Acme then supplied Heatco with a furnace for Builder's house. For a variety of reasons, construction of the addition was delayed and Builder decided not to move into Mansion and listed it for sale along with several other properties he was building. In January, six months after the installation of the Acme furnace, construction of Mansion was completed. Builder, who had not sold Mansion, complained to Heatco that the furnace was inadequate to heat Mansion. Heatco visited Mansion several times for repairs within the one year period, which has expired, but the furnace still did not heat the entire house. Builder never moved into Mansion and claimed that he sold the house to Kathy, after full disclosure of the problems with the furnace, for less than its market value because of the problems with the furnace.

What are rights of the parties?